In the Matter of Patrick F. SHEEHAN, Bankrupt.

No. 34351.

United States District Court, W. D. Missouri, W. D.

Jan. 17, 1970.

Donald B. Clark, Kansas City, Mo., for bankrupt.

Ralph L. Wright, Kansas City, Mo., for petitioner.

## ORDER REOPENING ESTATE IN BANKRUPTCY AND REMANDING TO REFEREE

BECKER, Chief Judge.

Western Auto Supply, a creditor of bankrupt herein, has filed in this Court its petition for review of the referee's discharge of the bankrupt. Bankrupt was adjudicated discharged by the referee in bankruptcy on December 24, 1968, over Western Auto's objection that the bankrupt had "failed to keep or preserve books, from which his financial condition and business transactions might be ascertained" and thus was barred from any discharge under Section 14(c) (2) of the Bankruptcy Act (11 U.S.C. § 32(c) (2)) and had failed to explain satisfactorily any losses of assets to meet his liabilities as required by Section 14(c) (7) (11 U.S.C. § 32(c) (7) ). In overruling the objection, however, the referee pointed out that the applicable section permits discharge of the bankrupt if the court deems the failure to keep books and records "to have been justified under all the circumstances of the case." The referee further noted:

"The Court has ascertained either from conferences with the attorneys or from the record proper itself that bankrupt, in addition to being a buyer for Western Auto, was also engaged in a systematic scheme of taking gratuities from suppliers of Western Auto in whatever category you want to call them, i.e. tips, bribes, loans or any other name that seems appropriate under the circumstances. This

had been going on for several years prior to the bankrupt filing in bankruptcy with 'under the table' money amounting to somewhere between $250,000.00 and $500,000.00 from the beginning to the end. It is doubtful whether the Referee or anyone else can ascertain the exact amount with definity (sic). The Court further understands that the bankrupt stated that all of the money he received, whether from Western Auto Company or outside sources, was deposited in certain accounts, the records of which were made available. The records are not complete, but the bankrupt stated that he had turned over everything he had or could find in the way of bank statements and cancelled checks. The Court further understood that at the time this bankruptcy was filed all the cancelled checks and records were in the possession of the Internal Revenue Department who were conducting a criminal audit. As a result of this audit, an indictment was filed against the bankrupt to which he pleaded *nolo contendere* and served thirty days of the sentence with the remainder being suspended. The matter of the civil liability to the Internal Revenue Department is still pending. The bankrupt further testified that he used these comingled (sic) funds in various business enterprises which turned out to be bankrupt enterprises themselves because of the dishonesty of the officers, agents and employees of these corporations. The file further reflects that the bankrupt is bothered with a serious medical problem. It is the Court's further understanding that even though a certain amount of restitution was made to the creditor-ex-employer, the objector to the discharge, that a $148,532.42 claim on a judgment rendered against the bankrupt is filed as a claim in this case. The Court further wishes to state that it recognizes that the privilege against self-incrimination cannot be relied upon as an excuse for not keeping records and that 'it is one of the mis-fortunes of bankruptcy if it follows crime.' In Matter of Harris, 221 U.S. 74 [, 31 S.Ct. 557, 55 L.Ed. 732]. The Court further recognizes that taking money in such a fashion as he did would be in a similar category as gamblers and bootleggers whose records are notoriously poor. Their documents and records are most of the time sparse and incomplete or as one court said 'a disorderly mass of unintelligible papers and records is insufficient.' In re Snyder, D.C., 112 F. Supp. 897. The Court further recognizes that the bankrupt cannot be classified in the 'mere employee or wage earner class.' In re Slutzkin, [D.C.] 60 F.Supp. 567."

The referee nevertheless found "that the bankrupt has made available to the trustee all of his cancelled checks and bank statements which he had and was able to produce and they are sufficient under the facts and circumstances;" that no assets above the statutory exemptions were shown to exist; and that "[d]eficiency of assets is satisfactorily explained by business losses."

A review of the transcripts, files and records in this case shows the following: that the bankrupt filed his petition in bankruptcy on February 20, 1967; that it was therein admitted that creditor Western Auto had, within the year immediately preceding the filing of the petition, obtained a judgment against bankrupt of $148,523.42; that petitioner listed debts in the total amount of $229,096.42; assets of $18,006.50, and exempt property in the amount of $15,-500; that at the first meeting of creditors held on March 23, 1967, the bankrupt testified that $55,600.00 of the $85,600.00 received by him from C. M. Buettner "went into Puritan [of which bankrupt was the sole stockholder] to try to bring the company into a profitable standpoint"; that such payments were not recorded "in a ledger or bookkeeping form" but were reflected in "bank statements and checks"; that bankrupt had no books and records at all; that $30,000 of the $85,600 received

from Buettner "went into Fairway" and was represented by a note which could not be located; that Puritan was currently in bankruptcy also and that it was an asset case; that $17,000 received from J. J. Levenberg was not a subject of any known record and "went into Puritan"; that $27,900 received from Cadrick Sales Company was not reflected in any books or records; that $32,000 received from Lipschulze Brothers was not reflected in any books or records but "went into Puritan"; that the above payments were in the form of gifts from those with whom he dealt on behalf of Western Auto; that the monies were put in bank accounts and commingled there with other funds before it "went to Puritan", but bankrupt was nevertheless certain that it all eventually "went to Puritan"; that bankrupt provided all the initial capital investment for Puritan but that all the stock was issued to one Swearingen; that the books and records of Puritan were currently in the hands of the trustee in bankruptcy, but bankrupt kept no records of why he was paying the amounts; that $23,000 received between 1958 and 1963 from Lee M. Goldstein Company "went into Puritan" after first being commingled with other funds in a bank account; that bankrupt may have paid income tax from these bank accounts, but he kould not recall any other expenditures; that between 1955 and 1963 he received $45,000 from General Products, most of which "went into Puritan" "outside of taxes I paid"; that $20,000 received from J & H Sales Company "went into Puritan" through Fairway; that profit-sharing money from Western Auto "went into Puritan"; that $25,000 from a Series E Bond "went into Puritan"; that "a couple of hundred thousand dollars was invested in Puritan"; that all of the bank statements, cancelled checks and deposit slips for bankrupt and the corporations had been turned over to the Internal Revenue Service; and that if one were to total the amount of bankrupt's claims as a creditor of Puritan Manufacturing Co., the amount of his capital investment as shown by the corporation books and records and the amount of the loans listed on the schedules, the total would be equal to the amount of the above various contributions and gifts received by him.

At a continued first meeting held on September 8, 1967, bankrupt testified that he could not find his bank statements; that he did not have any canceled checks; that he received all sums from various sources as asserted in the creditor's objections to discharge;[1] that Mr. King, trustee in bankruptcy for Puritan, had the canceled checks and statements; that the Internal Revenue Service had the books and records of Cartwright, Inc., on which he and his wife were authorized to draw checks; and that in the past 10 years he had received in excess of $300,000 from dealers with Western Auto, his employer.

The referee then ordered (off the record) the books and records produced by the bankrupt, but they were never produced, apparently because at least some of them were still in the hands of the Internal Revenue Service. A letter of June 24, 1968, from the referee to the bankrupt read in part as follows:

"In order that there be no misunderstanding by anyone or anything, please be advised that shortly after July the 10th I am going to file my findings of fact and conclusions of law on the creditor's objections to discharge immediately after July 10th. If there are any records of any kind or nature that have not been made available to the trustee and if you so desire to submit them to the trustee for examination I am going to leave

---

1. The objections itemized all the monies purportedly received by bankrupt from 1955 to 1964, amounts which bankrupt, at the first meeting, admitted amounted to over $300,000. In addition, the objec-tions produced certain figures to support a contention that Cartwright, Inc., was the corporation which received and allegedly concealed most or all of the specified amounts.

the matter open until July the 10th for that purpose. If all have been submitted, then, of course, there is no need for the waiting time until July the 10th. The reason for this letter and inquiry to you is due to the fact that in my mind at least, there is some confusion as to whether or not the Internal Revenue Service returned all of the records to the Tax Attorney and such were turned over to the trustee for examination or only parts of them were returned and it was upon this basis that an examination was made by the trustee and an interested creditor.

"If you would advise this court what action you plan to take, if any, in response to this letter, it would be very much appreciated. In my mind I have been lenient with the bankrupt in order to allow him to work at his various problems and to furnish this court with the necessary information to pass upon the motion presented. In my opinion, it is necessary to make a ruling on the objections to the discharge immediately after the 15th of July. I am going to permit either you or [counsel for creditor] to submit any additional evidence or facts that you may have on this matter up to and including July the 10th."

According to the brief of the objecting creditor, the books and records, bank statements and canceled checks were never considered by the referee in bankruptcy. Rather, as is supported by the statements of the above-quoted letter, some of the documents were turned over to the trustee and to the creditor. The objecting creditor's brief on its last bankruptcy court motion to fix a final date for the production of evidence reads as follows:

"Off the record at the hearing of September 8, 1967 the Referee directed the bankrupt and his attorney Mr. Donald B. Clark to make available to the trustee in bankruptcy Mr. Robert D. Sandifer all of the books and records of the bankrupt which would attempt to explain the financial condition and business transactions of the bankrupt and which would attempt to satisfactorily explain his loss of assets to meet his liabilities. Following the hearing on September 8, 1967, the Referee requested Mr. Sandifer to review the financial records of the bankrupt and to report to the Court his findings. Mr. Sandifer requested the Referee's permission to permit representatives of Western Auto to assist him in reviewing these financial records and this permission was granted. The bankrupt did not deliver any books and records to the trustee, and therefore, at the request of the trustee, representatives of Western Auto Supply Company called at the office of Donald B. Clark and Tom E. King on September 15, 1967 and Fairway Auto Supply on September 20, 1967 and physically picked up everything which the bankrupt stated constituted all of his books and records. All of these books and records were taken to the offices of Western Auto Supply Company at the request of the trustee Mr. Sandifer * * * An accountant in the employ of Western Auto did assist Mr. Sandifer in connection with examining the financial records and prepared a summary of his findings which was submitted to Mr. Sandifer on approximately October 15, 1967 * * * Sometime in early November, 1967 at the personal request of the Referee, Petitioner furnished the Court with a copy of the summary of these findings * * * In the Referee's letter of June 24, 1968 to Mr. Clark the date for ruling on Petitioner's specifications was extended until sometime immediately after July 15, 1968 * * * The Referee stated that the bankrupt would have until July 10, 1968 to produce and deliver to the trustee any additional books and records. * * * On August 21, 1968 the Referee informed Petitioner by telephone that the Internal Revenue Service did not have in its possession any books

and records belonging to the bankrupt."

It is not clear from the files, records and transcripts herein that any books and records were ever adduced before the referee. Further, it is clear that the referee had knowledge of the records given to the trustee only by way of the trustee's summary, which does not itself appear of record to indicate the extent of the referee's familiarity with the records. And the memorandum opinion in which the referee discharged the bankrupt made no reference to any of the books and records, cancelled checks or bank statements with regard to the evidence which they contained. Therefore, the petitioning creditor has moved to adduce additional evidence on its petition for review in this Court under Rule 29 of the Bankruptcy Rules because "it is clear from the Referee's Findings of Fact that he never made a personal examination of the books and records and it is the petitioning creditor's belief that such supplementary evidence will be helpful to the District Judge." Accordingly, petitioner wishes to adduce "the examination and testimony of the accountant who examined all of the books and records produced by the bankrupt". It is readily apparent, however, that this evidence which the petitioner wishes to adduce is evidence which should have been heard by the referee, since the evidence of record justifies neither the granting nor overruling of the objections to discharge. The evidence only shows that the bankrupt admits that he received in excess of $300,000 in gifts from various concerns in his capacity as a buyer for Western Auto and that it is his claim that all of the monies so received "went into Puritan [Manufacturing Company]," of which he became sole stockholder and which was also currently in bankruptcy as an "asset" case. Nothing appears in this record to indicate whether the payments into Puritan were capital expenditures or loans, nor, in the latter case, that bankrupt has any creditor claim pending in that case, nor the size of the current assets of Puritan in the hands of the trustee, nor the amounts of any later withdrawals of funds from Puritan. Further, petitioner now purports, as a result of its accountant's examination of the records which bankrupt did produce, to have evidence to show that since January 1, 1958, bankrupt received sums totaling $348,-474.46—$88,951.05 in salary and $259,-523.41 from suppliers' and manufacturers' representatives; that the records show at most a maximum investment in Puritan of $61,800; and that bankrupt's total disbursements accounted for by check book entries and canceled checks is $136,652.26. If these figures are correct, a substantial figure of $150,022.20 in possible assets has been left unexplained by the failure of the bankrupt to keep books and records. Further, petitioner purports to have some evidence to show that Cartwright, Inc., might have been a corporation formed by or participated in by the bankrupt which somehow secreted away and disposed of these unexplained amounts.

█ Plainly, this is evidence which should be heard by the referee. The books and records constitute the "best evidence" of the bankrupt's transactions. It is apparent from the referee's finding that there are $250,000 to $500,000 of assets unexplainably unaccounted for, that the evidence thus far in the record is not sufficient to sustain either the finding that the records kept by bankrupt were sufficient or the finding that the disappearance of these assets is satisfactorily explained, especially in view of the bankrupt's original contention that the monies all "went into Puritan".

█ The controlling statute, Section 32(c) (7) of Title 11, U.S.C., provides in relevant part:

"* * * That if, upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this subdivision c, would

prevent his discharge in bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt."

"A party objecting to discharge has the initial burden of proof. He must show 'reasonable grounds for believing that the bankrupt has committed' some act which would prevent his discharge." Collier's Bankruptcy Manual ¶ 14.05. The petitioner has not done this on the record so that the burden of explaining the failure to keep books or deficiency of assets, or both, shifts to the bankrupt. But the petitioner has been prevented from so showing by the delay of the bankrupt in producing the available books and records in the absence of a formal order by the referee and by the fact that the referee had the books and records only referred to trustee and petitioner instead of entered as evidence in the first meeting and refused to continue the first meeting for any such purpose beyond July 10, 1968. Thus, petitioner had no opportunity to meet his burden of proof and the examination of the bankrupt, insofar as he was not permitted to rebut the available evidence, was not completed. In such a case, Section 32(b) of Title 11, United States Code, comes into applicability. It reads, in pertinent part, as follows:

"The court shall make an order fixing a time for the filing of objections to the bankrupt's discharge which shall not be less than thirty days after the first date set for the first meeting of creditors. Notice of such order shall be given to all parties in interest as provided in section 94(b) of this title. If the examination of the bankrupt concerning his acts, conduct, and property has not or will not be completed within the time fixed for the filing of objections to the discharge the court may, upon its own motion or upon motion of the receiver, trustee, a creditor or any other party in interest or for other cause shown, extend the time for filing such objections. * * *"

When it is the bankrupt who is the agent of the delay in the inquiry into the extent of his assets and liabilities, the referee should grant the extension in order to hear the entirety of the available evidence. See In re Baker (W.D. Mo.) 299 F.Supp. 404. Therefore, this bankruptcy estate should be reopened and the referee should take of record the additional evidence offered by petitioner together with that which bankrupt might offer in rebuttal. Such evidence as is offered by the petitioning creditor and the bankrupt shall, in either case, be reported only at the expense of any party desiring a transcript. The petitioner and the bankrupt should be permitted to enter all relevant evidence which is admissible ordinarily in the first meeting of creditors and the referee should consider the additional evidence on whether to discharge or bar the discharge of the bankrupt and accordingly should base his decision in that respect on findings which have specific reference to the additional evidence thus taken. It is therefore

Ordered that this bankruptcy estate be, and it is hereby, reopened and remanded to the referee for treatment consistent with this opinion.